## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**LARRY SHABBAZ GOODEN, JR.,**

**Defendant.**                                          **No. 07-CR-30015-DRH**

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

Pursuant to the declaration during the sentencing hearing of August 18, 2008, the Court issues this Order setting forth Larry Shabbaz Gooden's sentence and the rationale for that sentence.

## BREACH OF WRITTEN PLEA AGREEMENT

On July 20, 2007, Gooden, entered into a written plea agreement and plead guilty to one count of conspiracy to commit kidnaping in violation of 18 U.S.C. § § 1201(a)(1) and (c) and one count of knowingly using a firearm during a crime of violence in violation of 18 U.S.C. § § 2, 924(c)(1)(A), and 924(c)(1)(B)(i) (Docs. 54, 55, & 56). Prior to the sentencing, the Government moved for a finding that Defendant Gooden breached the plea agreement (Doc. 101). Specifically, the Government

argued that Gooden committed a material breach of the plea agreement by failing to inform the Government of a sexual assault against a sixteen-year-old girl at gunpoint that he and his co-Defendant Barry Chester Williams perpetrated during the course of their horrific six day crime spree.[1]  Without dispute from the Defendant as to the proffered evidence or the motion to find that he breached the agreement, the Court did enter a finding that said agreement was breached. The Court, therefore, proceeded on the guilty plea as an open plea, the Defendant not being accorded the right to withdraw his plea by operation of the terms of that agreement in the event of such an occurrence as that which took place.  The Court now turns address its reasons for Gooden's sentence.

**LEGAL STANDARD**

The sentencing landscape has changed considerably since the landmark case of ***United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 621 (2005).**  Gone are the days when the sentencing court merely applies the sentencing guideline to a case, explaining to the defendant that his hands are, for all practical purposes, tied.  That, within some range, his sentence is predetermined once the variables of his offense conduct, acceptance of responsibility and criminal history are plugged into the formula.  It is further clear now that the Supreme Court has given us ***Rita v. United States*, 551 U.S. ___, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)**

---

[1]After Gooden was charged and arrested in this case, he provided a sample of his DNA that was entered in the Combined DNA Index System ("CODIS").  In May 2008, the St. Louis Metropolitan Police Department received a CODIS match for an unsolved sexual assault that occurred on October 29, 2006, during the time of Gooden's crime spree.  Photographic lineups were then presented to the sexual assault victim, who identified her two assailants as Barry Williams and Larry Gooden.

and ***Gall v. United States***, **552 U.S. \_\_\_, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)** that the proper procedure, as a starting point and initial benchmark, is for the sentencing court to correctly calculate the sentencing range as determined by the Guidelines. Each party is to be given an opportunity to argue for whatever sentence he or she deems appropriate in the case. Thereafter, the district judge is to consider all of the section 3553(a) factors, without giving a presumption of reasonableness to the Guidelines. An individualized assessment of the factors as weighed against the facts in the case must be made. According to the nation's highest court: "If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." ***Gall,* 552 U.S. at page 597.**

## CRIMES OF CONVICTION

### STATUTORY MAXIMUM

### GUIDELINE RANGE

Gooden has been convicted in Count 1 of conspiracy to commit kidnaping which is a Class A Felony that has a statutory range of any term of years or life in prison, a maximum fine of $250,000 and a special assessment of $100. He also has been convicted in Count 4 of use of a firearm during a crime of violence which is a Class A Felony that has a statutory range of not less than 10 years consecutive to any other count, a maximum fine of $250,000 and a special

assessment of $100. Based on Gooden's total offense level of 37 and a criminal history of category of V, the guideline range on Count 1 is 324 to 405 months in prison and the guideline range on Count 4 is 120 months in prison to run consecutively with Count 1, a fine range of $25,000 to $250,000 and a special assessment of $200. These findings were without dispute.

**18 U.S.C. § 3553(a) FACTORS**

In sentencing Gooden, the Court considers the following relevant factors outlined in **18 U.S.C. § 3553(a)**: (1) the nature and circumstances of the offenses; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; (5) the need to protect the public from further crimes of the defendant;(6) the need to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; (7) the need to consider restitution; (8) the need to consider the kinds of sentences available, as well as the sentencing range established for the applicable category of offenses committed by the applicable category of defendant set forth in the sentencing guidelines, in effect, including amendments yet to be implemented as called for by Congress; (9) consider any policy statements the Sentencing Commission has in place or about to be in place; and (10) the need to avoid unwarranted sentencing disparities among defendants everywhere with similar

records who have been found guilty of similar conduct.

**SENTENCE IMPOSED**

        The Court determines that Defendant should serve **600 months** in prison for his crime: 360 months in prison on Count 1 and 240 months in prison to run consecutively to Count 1 on Count 4.  Despite defense counsel's attempt to portray the Defendant as a mentally deficient person who was led down a path of criminality, it is clear to the Court that Gooden was a full partner in the six day crime spree of kidnaping armed violence, robbery, abduction, and an attempted sexual assault.  There was an actual sexual assault, which the Court does not consider for sentencing, but which was used as the basis to nullify the Defendant's cooperating plea agreement.

        This sentence represents a guideline sentence relative to Count 1.  The guidelines, as the Government points out, simply calls for the minimal time specified by the statute (10 years to life) as the guideline sentence for the consecutive sentence on the weapons conviction (Count 4).  Therefore, the sentence imposed by the Court represents a doubling of that minimal guideline sentence.  Whether one parses the sentence and examines Count 1 separately from Count 4 or considers them together to analyze the full 50 year sentence, the Court, as will be developed hereafter, finds that the separate sentences and the combined sentences are no greater than necessary under the particular circumstances of this case and the result is a just and reasonable sentence as a consequence.

**<u>DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE</u>**

The Defendant relied on his theory in his motion for a downward departure (Doc. 103), which was based on the argument of diminished capacity. The gravamen of his argument is that the Defendant was manipulated by the co-Defendant to do all the horrendous acts charged and admitted to by the Defendant due to his reduced mental capacity. To quote from the motion and sentencing memorandum:

> Some of the clinical implications of this lifelong disability are that he is significantly impaired in terms of the following abilities:
> 1. to express himself and understand the significance of what people tell him
> 2. to exercise good judgment when making decisions that affect his future
> 3. **to protect himself from the manipulations of others** who might exploit him for their own gain.

Since the above language is not attributed to the report and the Court cannot find the language anywhere in either court-ordered psychological evaluation of the Defendant, it is clearly advocacy by the talented counsel representing Defendant. The difficulty for counsel and the Defendant is that the evidence does not support the Defendant's theory of diminished mental capacity. In the opinion of the psychologist, Mr. Gooden did not and does not suffer from a mental defect. He has

mental disease, but it is only a mood disorder. Even at that, it is not a specified disorder because he is not fully depressive or bipolar. He is in a mildly depressive mood, irritable, has racing thoughts at times and experiences some mild sleep disturbances. He also exhibits an antisocial disorder, described as "a pervasive pattern of disregard for, and violation of, the rights of others beginning in childhood or early adolescence and continuing until adulthood." (See pages 9 and 10 of the Criminal Responsibility Evaluation.) To further quote, on page 10 of the same report: "Mr. Gooden has a history of conduct disordered behavior since his childhood. He has a juvenile criminal record and attended a special school as a result of his behavioral problems. His school records suggest as a child, he was manipulative, aggressive with his peers, and defied authority. His mother reported he has a history of engaging in conduct disordered behavior and as a child did not tell the truth, fought with his peers, and engaged in risk taking behaviors." Hardly sounds to this judge as the one being led around doing things against his will or against his better judgment. Sounds much more the manipulator than the manipulated.

The Defendant relies on the guidelines, of course, in his motion for a downward departure. Unfortunately, that same set of guidelines work against him. Section 5K2.13, in the first part discusses the Commission's policy regarding courts relying on a defendant's diminished mental capacity as a basis for a departure downward. However, in the second paragraph, such a departure is precluded, as a policy of the Commission, when the defendant's offense conduct was that of violence

and, clearly, the offense of conviction herein involved violence.

A reading of the two psychological reports in this case, as well as the evidence of the Defendant's offense conduct, including relevant conduct, demonstrates, not just by a preponderance of the evidence, but by clear and convincing evidence, that the Defendant's motion for a downward departure (Doc.103) must be **DENIED** for a just and reasonable sentence to be imposed.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

On October 26, 2006 the Defendant and his accomplice entered a laundromat, with a sawed-off shotgun, forced a male patron, victim number one, at gunpoint, into a bathroom.  The victim was robbed of his wallet, money, and car keys and threatened with death, all while the shotgun was pointed at him.  He was warned to cooperate and the Defendant struck him in the mouth with his fist for an apparent demonstration of seriousness.  Victim number one was forced into the trunk of his car where he would remain for the vast majority of the time until he was eventually able to escape October 28, 2006.  He was forced to give up his pin for his atm card so the Defendant and his accomplice could make occasional withdrawals over the ensuing interval of time as they drove around the St. Louis metropolitan area with victim one in the trunk of the car.  This victim was caused to suffer the Defendant telling him, at one point, that he wanted, "to kill you so bad, my dick is hard."  In addition to being convinced he would die, the Defendant and his accomplice stole from victim one, $3,465.85.

After victim one escaped, Defendant and his co-Defendant kept the car and on October 30, 2006, shortly after midnight, they again used the sawed-off shotgun and a 9 mm handgun to rob two truck drivers (victims two and three). When these two victims did not have what the robbers thought was sufficient booty and became angry, a scuffle ensued. The victims grabbed the weapons, but unable to get the Defendants to loosen their grips, the victims opted to flea instead. The victims were physically injured and lost $60.00 and $5.00 respectively.

Nearly three hours later, the co-Defendant put the sawed-off shotgun in the back of a female patron of a fast food restaurant (victim number four) while seated in her car and forced her to the passenger side of the car. Williams drove victim number four's car as Defendant followed in victim number one's car. They drove to a large parking lot. The co-Defendant told Gooden to "watch his back" while he proceeded to tell victim number four to remove her clothes. She refused and while holding the shotgun, Williams threatened to slap victim number four. Williams then attempted to drag victim number four into the back seat and a struggle ensued with victim number four attempting to wrestle the shotgun away from Williams, causing the shotgun to discharge into the dash of the car. Gooden intervened and threatened to hit victim number four if she did not let loose of the gun. She complied. Williams attempted to start victim number four's car, but to no avail. Williams ordered victim number four into victim number one's car. As it turns out, the local police department was just on the other side of the buildings behind which they had parked and the police responded to the shotgun blast. Gooden and

Williams fled on foot.  Gooden returned a short time later and fled in victim number one's car.

A high speed chase was precipitated by the Defendant's efforts to elude the police who responded to the shotgun blast.  Defendant led the police back into Illinois at speeds in excess of 100 miles per hour.  Ironically, the chase ended when the Defendant crashed very near another police station.  The Defendant was immediately apprehended at the crash site.  The sawed-off shotgun was found in victim number one's car.  The Defendant was wearing one of victim number one's shirts and was in possession of victim number two's wallet.

The Government refers to the Defendant's crime spree as "utterly terrifying and destructive."  The Court finds that the Defendant was a full partner in this crime spree that spanned six days and that included kidnaping, armed violence, robbery, abduction, and attempted sexual assault.  The conduct of the Defendant is off the scale of seriousness and violence.  It is clear that Gooden is a violent brutal criminal.  There were four separate victims in this case and a firearm was displayed during each incident.  During one incident, a victim suffered an injury to his arm and back while struggling with Gooden and his accomplice.  In another incident, the firearm was discharged during a struggle with a female victim. [The Government points to a separate, unrelated incident, the evidence for which is strong and uncontested, a sixteen year old female was raped and robbed of $15 at gunpoint.]

**THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

          The Government noted that some of the Defendant's criminal history was not counted in determining his criminal history category for guideline purposes. The Government argues that the Defendant, based on his criminal history and the offenses of conviction, is a man who has not gotten "the message." The prosecutor describes the Defendant as a "dangerous man." Defense counsel, as previously alluded to, relies solely on the theory that the Defendant is a man of diminished capacity, a man who is always led, man who does the "dirty work" of others. The Court, as previously found and noted, does not agree with defense counsel. The Court believes the Defendant is a danger to society based on his criminal history, his demeanor, his attitude, his inclinations and his crimes of conviction. He is, to put it bluntly, a violent, brutal criminal. His criminal history demonstrates a penchant toward crimes of violence. His background, even his history in school, demonstrates an attitude of violence and an inclination to do whatever he wants no matter the consequences on others. His statement to victim number one regarding his extraordinary physical desire to kill him, clearly sent fear to the deepest parts of his soul, and should make all of society shudder in fear, but for that fact he is locked safely away. He was on parole at the time of the instant offenses, lending credence to the Government's theory that he has not gotten the message of retribution and rehabilitation. To say that this Defendant has not gotten "the message" is a serious understatement. On the other hand, this Court is well convinced that the Defendant does not care about the message. He has his own message. As his own mother has

said, he does what he wants, without care or concern about the impact, negative or otherwise, on other people.

Moreover, Gooden has a prior conviction for aggravated vehicular hijacking with a weapon and a prior conviction for residential burglary that was not accounted for in the guidelines.

It came to light, while awaiting sentencing, from a DNA match through CODIS, and a positive photo identification from the victim, all strong evidence which the Defendant did not contest during the issue regarding whether he breached his plea agreement, that the Defendant and his co-Defendant, during the six-day crime spree also robbed and both raped a sixteen year old girl. Although not considered for purposes of sentencing directly, it certainly corroborates the brutal criminal conduct that was characterized in the instant offenses and the Defendant's criminal history. The brutal use of the firearm in this case along with the Defendant's long history of violent behavior weigh heavily in the Court's analysis of increasing the period of incarceration for the consecutive sentence for Count 4. One just has to read the account of the Defendant's conversation with the psychologist and the findings of the doctor to understand that this Defendant is a person who is dangerous to society. Not dangerous because of his mental vulnerabilities, but dangerous because of his attitudes. Of course, the guidelines cannot account for the demeanor and attitude that are reflected in the psychological evaluations.

The analysis of the Defendant reveals a very dangerous man, a man whose criminal violence is escalating, a man against whom the public must be

protected for a very long time into the future.

In mitigation, the Defendant had little parental involvement as a child, and it is safe to say what involvement there was, likely was not positive. He had to fend for himself on the streets, he says, from the age of twelve. We must expect bad conduct from that kind of background, but the Court would submit that even with that childhood, the conduct of these offenses exceeds those expectations.

## SERIOUSNESS OF THE OFFENSE, RESPECT FOR THE LAW, JUST PUNISHMENT

The Government simply argues, in this case, that this factor calls for a strong sentence. There is no question that a very strong sentence is called for. The St. Louis metropolitan area was subjected to terror for six days. One was only fortunate that you were not one of the four victims in this case (or the one unrelated victim) during this time when the Defendant and his co-Defendant went out "to get some cash" because the co-Defendant needed some money. Of course the crimes are very serious and clearly a strong message for respect for the law needs to be sent. However, there is a very strong component here of a just punishment for the crime. A sentence below the guideline range for Count 1 would be a travesty in the opinion of this court. Furthermore, considering that just having a gun along for one offense and doing nothing with it, just so it furthers the crime, justifies a ten year consecutive sentence for guideline sentencing, when the statute calls for "at least" a ten year sentence, suggests to this Court that, in this case, a guideline sentence on Count 4

is less than what is necessary and less than what is called for.  The Defendant and his co-Defendant used the gun on four victims in this case alone, not counting the unfortunate sixteen year old that we are not allowed to consider here.  The gun discharged once, as victim number four tried to save herself from a fate too dreadful to consider.  That victim (No. 4) is very lucky that the only thing that shot disabled was her car and she was ultimately able to walk away with "only" the mental trauma of the day's events.  Perhaps she won't agree with the Court's assessment.  Not only were there four victims against whom firearms were used, but there were multiple and separate crimes spread out over six days.

## ADEQUATE DETERRENCE TO CRIMINAL CONDUCT

Again, the Government simply argues that this factor calls for a strong sentence.  It is more than clear in this case, that persons like the Defendant and any others contemplating actions even remotely similar to the smallest portion of the criminal conduct here, need to understand that they will be removed from society for a very long time if they pursue this kind of conduct.

## PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

The Government here argues that this is the dominant factor above all others.  It points out that the victims did not see the Defendant, effectively, could not anticipate and prepare for what was about to happen to them.  The public must be

assured that this Defendant will be removed from the community for a very long time because he has proven that if he is in the community the people are in danger. He demonstrated with his long criminal history and crime-based narcissism that he cannot live in a law-abiding manner. Unfortunately, for society, his wrong-doing has escalated in shocking way. His actions, his statements, his attitude make it clear that he is extremely dangerous and the only way to make society safe is to house him out of society until such time as he is physically and emotionally unable to harm society anymore. He is more dangerous, when one delves into the cases deeply, than his co-Defendant. There are not many crimes, nor many criminals, that one can say that forty years is not enough time. This is such a case and this is such a defendant. Fifty years approaches a sufficient amount of time, one hopes.

## EDUCATIONAL, VOCATIONAL TRAINING, MEDICAL CARE

## CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER

This Defendant cannot, in the opinion of the Court, be rehabilitated. The counsel for the Defendant believes he needs mental rehabilitation. The psychological evaluations do not agree. It is possible that the Defendant's depression may become worse and he may have to be treated for that while incarcerated. There is certainly something wrong, mentally, with someone who believes he can treat other human beings as this Defendant has treated his victims. And someone who gets so excited at the prospect of killing someone that he experiences physical arousal is not normal. Perhaps the Bureau of Prisons offers cognitive behavioral classes or group

therapy classes that will benefit the Defendant.  Otherwise, the Defendant simply needs to know that his correctional treatment is to spend year after year locked up, when if he did not commit crimes, he would not have to lose his liberty and be locked away.

**RESTITUTION**

Restitution in this case is in the amount of $3,530.85, a joint and several liability, with the Defendant's co-Defendant Barry Chester Williams.  Each of them has a sufficient time in prison, through the inmate responsibility program, they should be able to pay most, if not all, of this restitution off by the time they get out of prison.  If not it shall be a condition of supervised release.  The record reflects the persons to whom the restitution must be paid.

**THE KINDS OF SENTENCES AVAILABLE**

**THE SENTENCING RANGE SET FORTH IN THE SENTENCING GUIDELINES**

Clearly, there are no alternatives to incarceration available in light of the statutory prohibition to probation available in this case.  Naturally, even if probation was possible, it would be a true travesty of justice to hand down such a sentence.

Just as clearly, the Court has considered the guidelines and its analysis of the factors and whether a guideline sentence or a sentence which varies from the guideline range is contained throughout this order.  The rationale herein also makes

very clear that much of the Defendant's history and characteristics are not covered by nor considered by the Guidelines.

**ANY POLICY STATEMENTS THE SENTENCING COMMISSION HAS IN PLACE**

The Court has certainly taken into account the policy statements of the Commission in its analysis heretofore regarding the Defendant's diminished capacity defense as a basis for a downward departure. Likewise, the Court has taken into account the Commission's policy statements in applying guidelines for calculating the ranges that are applicable to the Defendant, including enhancements and the deduction the Defendant enjoyed for his acceptance of responsibility.

**NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES**

There are different ways to view disparities here. First of all, with respect to Count 1, the Court imposed a sentence within the guideline range of 324 to 405 month by establishing a sentence of 360 months. Similarly situated defendants, therefore, are going to be sentenced somewhere within that guideline range nationwide. This sentence is just below the median of the range. As for the case itself, Defendant's co-Defendant, Mr. Williams, was sentenced to 360 months for Count 1. To the extent that consistency within the case counts for something, and in a case like the one at bar, the Court submits, it should, then a 360 month sentence is certainly in keeping with that factor.

With respect to Count 4, it is true that Defendant's sentence varies

substantially from his co-Defendant. However, his co-Defendant had the advantage of a cooperating plea agreement and the recommendation from the Government for a low-end guideline sentence. Such recommendations are not rejected out-of-hand by the Court without substantial reason. One could argue the reasons the Court is giving herein to justify its sentence for this Defendant are reason enough to reject the Government's recommendation and to sentence Mr. Williams just as the Court is sentencing this Defendant. While this Court is no stranger to rejecting the Government's recommendations when it feels justified in doing so, there was no reason for this Court to believe that an overall sentence of forty years for Mr. Williams was insufficient. Neither Mr. Williams nor Mr. Gooden are being sentenced by this Court for the rape of the sixteen year-old girl that came to light as the Defendant herein awaited sentencing. That event became the undoing of the Defendant's plea agreement. Mr. Williams did not have the criminal history nor the psychological profile to match the Defendant on which the Court relies, in part, in justifying an additional ten years of incarceration. Likewise, this Court has found many aspects of this Defendant's history and characteristics which are simply not accounted for by the Guidelines, which was not the case with his co-Defendant.

As to the overall sentence variance in Count 4 and the extent to which that sentence places this Defendant at odds nationally with other defendants charged with a firearm charge, this Court believes the multiple victims, multiple days, multiple events/crimes, as well as this Defendant's history and characteristics set him apart from the typical defendant charged with use of a firearm during a crime

of violence.  It is submitted that the typical case for which consecutive sentences are usually imposed are one victim/one crime situations.  Further, the Court relies on the rationale not specifically mentioned in this paragraph for further reliance relative to this factor.

**FINE**

It is further Ordered that Gooden shall pay to the United States a total fine of **$1,000.00**, consisting of $500.00 on each of Counts 1 and 4, payable through the Clerk of the United States District Court.  This represents a departure on the Court's finding that the Defendant cannot afford a fine within the guideline range.

The fine and restitution shall be paid through the Clerk of the United States District Court and is due immediately.  Any payment that is made that is not payment in full shall be divided proportionately among the victims named.  The Defendant's restitution obligations shall be joint and several with Barry Chester Williams.  If the Defendant is unable to pay the restitution immediately, then payments shall be required while the Defendant is incarcerated in the U.S. Bureau of Prisons, in compliance with the Inmate Financial Responsibility Program.  While incarcerated, the Defendant shall make monthly payments consisting of one-half of the amount of monthly deposits into Defendant's inmate trust account; however, if the account balance is less than $20, no payment shall be required.  The Court finds that Defendant does not have the ability to pay interest and it is waived.  If the

Defendant is unable to satisfy the restitution during the period of incarceration, the payment of any unpaid balance shall become a condition of supervised release.

**<u>SUPERVISED RELEASE</u>**

Upon release from imprisonment, the Defendant shall be placed on supervised release for a term of five years. This term consists of a term of five years on each of Counts 1 and 4, all such terms to run concurrently. Within 72 hours of release from custody of the Bureau of Prisons, the Defendant shall report in person to the United States Probation Office in the district to which the Defendant is released.

While on supervised release, the Defendant shall not commit another federal, state, or local crime and shall comply with the standard conditions that have been adopted by this Court and which shall be written completely in the judgment of the Court.

The Defendant shall refrain from any unlawful use of a controlled substance. The Defendant shall submit to one drug test within 15 days after being release on supervision and at least two periodic drug tests thereafter, not to exceed 52 tests in one year.

The Defendant shall not possess a firearm or destructive device.

The Defendant shall cooperate in the collection of DNA as directed by the probation officer.

In addition, the Defendant shall comply with the following special

conditions:

(a)     The Defendant shall pay any financial penalty that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release. The Defendant shall pay the fine in installments of $25 per month or ten percent of his net monthly income, whichever is greater.

(b)     The Defendant shall provide the probation officer and the Financial Litigation Unit of the United States Attorney's Office with access to any requested financial information. The Defendant is advised that the probation office may share financial information with the Financial Litigation Unit.

(c)     Due to Defendant's substance abuse history, he shall participate as directed and approved by the probation officer in treatment for narcotic addiction, drug dependence, or alcohol dependence, which includes urinalysis or other drug detection measures and which may require residence and/or participation in a residential treatment facility. Any participation will require complete abstinence from all alcoholic beverages. The Defendant shall pay for the costs associated with substance abuse counseling and/or testing based on a co-pay sliding fee scale approved by the United States Probation Office. Co-pay shall never exceed the total costs of counseling.

(d)     The Defendant shall participate in a program of mental health treatment, as directed by the probation officer, until such time as the Defendant is released from the program by the probation officer.

(e)     In light of the Defendant's failure to comply with previous post-judgment orders, Defendant shall submit his person, residence, real property, place of business, computer, or vehicle to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The Defendant shall inform any other

residents that the premises may be subject to a search pursuant to this condition.

It is further ordered that the Defendant shall pay to the United States a special assessment of **$200**. The special assessment is payable through the Clerk of the U.S. District Court. Further, the Court **GRANTS** the Government's oral motion to dismiss Counts 2, 3 and 5 of the Superseding Indictment. The Court **DISMISSES** Counts 2, 3 and 5 of the Superseding Indictment.

**IT IS SO ORDERED.**

Signed this 26th day of August, 2008.

/s/     *David R Herndon*
**Chief Judge**
**United States District Court**